2025 IL App (2d) 240765-U
Nos. 2-24-0765 & 2-24-0766 cons.
Order filed September 16, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| DIANA COLIN, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 24-OP-1293 |
| | ) | |
| LATOSHA MONTGOMERY, | ) | Honorable |
| | ) | Reginald N. Campbell, |
| Respondent-Appellant. | ) | Judge, Presiding. |

| | | |
|---|---|---|
| ARLENE SANCHEZ, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 24-OP-1294 |
| | ) | |
| LATOSHA MONTGOMERY, | ) | Honorable |
| | ) | Reginald N. Campbell, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: Respondent's briefs on appeal from the entry of plenary orders of protection fail to comply with supreme court rules. Further, her arguments either are forfeited as undeveloped or patently lack merit.

¶ 2       *Pro se* respondent, Latosha Montgomery, appeals plenary stalking/no contact orders entered against her and in favor of petitioners, Diana Colin and Arlene Sanchez, in case Nos. 24-OP-1293 and 24-OP-1294, respectively. The appeals were docketed as Nos. 2-24-0765 and 2-24-0766, respectively. We have consolidated the appeals for decision. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND[1]

¶ 4       On August 21, 2024, Colin and Sanchez each filed a verified petition for a stalking/no contact order against respondent. Both women were employees of the Boys & Girls Club of the Northwest Suburbs. Respondent's two children were club participants.

¶ 5       Colin's petition alleged that, on July 11, 2024, respondent arrived to pick up her children at a public pool in Carpentersville. When Colin told respondent that it was against club policy for children to be picked up from that location, respondent became upset and told Colin that she was " 'going to kick [Colin's] ass.' " Colin's petition alleged further that, on August 19, 2024, respondent entered the club's building while "screaming" and calling out Colin's name. As Colin left the building, respondent threatened others present. Colin then called 911.

¶ 6       Sanchez's petition alleged that, on August 14, 2024, she spoke with respondent about a situation between respondent's child and another child in the program. Because of respondent's disruptive demeanor, Sanchez had asked respondent to go outside with her to discuss the issue.

---

[1]The record in each case consists of (1) the common law record and (2) a report of the proceedings from the November 14, 2024, hearing on each petition. We note, however, that neither report of proceedings contains the trial court's ruling. We note too, that while the record in appeal No. 2-24-0766 contains an exhibit list, the sole exhibit listed—a security camera video—was not tendered to the clerk and, thus, is not in the record.

As respondent walked away after the conversation, she told Sanchez that " 'she had something in her back pocket and was not afraid to take it out.' "  Sanchez's petition further alleged that, on August 19, 2024, respondent entered the building and was "screaming [Sanchez's] name, stating she was going to find [her] and 'beat [her] ass.' "  Respondent left, and the police were called. Respondent returned and again threatened Sanchez.

¶ 7    The trial court issued emergency stalking/no contact orders in each case, effective August 21, 2024, through September 11, 2024.  Both petitions were set for a hearing on September 11, 2024, and summonses were issued.

¶ 8    On September 11, 2024, the same counsel entered an appearance for both Sanchez and Colin.  That day, the trial court extended the emergency orders of protection, continued the cases "for service on [r]espondent," directed the issuance of alias summonses, and set the matters for a hearing on October 2, 2024.  Alias summonses were issued on September 16, 2024.  Thereafter, the two cases followed the same procedural progression with identical filings (with one minor exception, which will be noted.)

¶ 9    On September 30, 2024, an authorized process server filed an affidavit of service. According to the affidavit, at 2:05 p.m. on September 25, 2024, the server attempted to serve respondent at her East Dundee residence but was unsuccessful.  He noted that there was a package on the porch and that no one was home.  Later that day, at 5:44 p.m., he returned to the residence and successfully served respondent.  Specifically, he stated that the package was gone and that he had spoken with respondent through her doorbell camera.  He advised respondent that he had orders from the Kane County court.  Respondent refused to open the door and said she would not accept the orders.  The process server placed the documents on the door handle and took a picture. He also mailed the documents via First Class mail.

¶ 10    On October 2, 2024, the trial court entered plenary stalking/no contact orders in each case. Petitioners were present; respondent was not. The court found that respondent was served with process and notice and that she was in default. The court made the plenary orders effective through October 2, 2026.

¶ 11    On that same day, in Sanchez's case, respondent filed a motion to "throwout [*sic*]." She claimed that the charges were "fake" and in "retaliation for [her] filing a discrimination charge." (No similar motion was filed in Colin's case.)

¶ 12    On October 23, 2024, respondent filed in each case a motion to (1) "[r]e-hear the original or amended [v]erified [p]etitioner [*sic*] for [e]mergency [s]talking [n]o [c]ontact [o]rder" and (2) "[v]acate the [e]mergency [s]talking [n]o [c]ontact [o]rder." She alleged that she (1) "did not receive prior notice of the initial hearing in which the [e]mergency [s]talking [n]o [c]ontact [o]rder was entered," (2) had a meritorious defense, and (3) was entitled to rehearing. (We note that, in arguing that she did not receive prior service, respondent erroneously cited provisions of the Civil No Contact Order Act (see 740 ILCS 22/101 *et seq.* (West 2022)), which is not at issue here.)

¶ 13    On October 30, 2024, over petitioners' objections, the trial court granted respondent's motions and vacated the default plenary stalking/no contact orders. The court reinstated and extended the emergency stalking/no contact orders through November 14, 2024, and continued the matters for rehearing. Each order indicated that the parties were given until November 7, 2024, to exchange discovery.

¶ 14    Two separate hearings (one for each petition) were held on November 14, 2024. The hearing on Colin's petition (case No. 24-OP-1293) occurred first. Colin and her counsel attended via Zoom; respondent was present in the courtroom.

¶ 15   Colin testified that she was "an area director at the Boys & Girls Club of Dundee Township." Respondent was a parent of two children who attended one of the sites that Colin oversaw. Colin first encountered respondent in the summer of 2024 at a community pool when respondent arrived to pick up her children. Colin told respondent that, although the club's policies did not allow children to be picked up from a field trip, she would allow respondent to pick up her children on that one occasion. Respondent "wasn't very happy," called Colin " 'a little girl,' " and said that "she was going to beat [Colin's] ass." This caused Colin "anxiety," and she was "worried about [her] safety."

¶ 16   Colin's next interaction with respondent was on August 15, 2024, over a Zoom call, during which club staff agreed to make accommodations for respondent to pick up her children from club activities.

¶ 17   On August 19, 2024, Colin e-mailed respondent, reminding her that she needed to comply with the agreement reached during the August 15 Zoom call. Respondent was "very upset." According to Colin, respondent "ended up coming into the office that day because she said that she was going to be removing her two kids from [the] club and she wanted a refund." According to Colin, respondent "came into the office" and was "yelling for [Colin]." She asked for Colin "by name." Colin became "worried" and "was getting up to go out there" when "Mike" (presumably, Mike Berg) walked out. She saw respondent "starting to threaten [Berg] and yelling at him, getting into his face." Respondent "was telling everybody there that she was going to beat their ass." Colin called 911 because she did not feel safe. Colin had a panic attack that day. The event was "very traumatizing for [her]," and she has since suffered "a lot of panic attacks."

¶ 18   Respondent testified that she never had contact with Colin at the pool. According to respondent, the incident to which Colin referred happened with "Arlene." Respondent claimed

that Colin started e-mailing her on August 14, 2024, and that she had "a whole email transcript" between them. Thereafter, respondent had a Zoom meeting with Colin and "Mike Berg," which, according to respondent, was the first time that she met Colin. She testified further that her children were "dropped from Boys & Girls Club" on August 19, 2024. She went to the office to pick up a refund check and asked to speak to Colin. She testified that she was not "yelling" Colin's name but was being "assertive." She spoke only to Berg. She testified that the incident was video recorded. She acknowledged that, "in the video ***, [she] and [Berg] end[ed] up having words," but she clarified that "[t]here was nothing directed towards them. They are not in the video."

¶ 19 When the trial court asked petitioner's counsel whether he had rebuttal evidence, counsel told the trial court that he wanted to share "that video from the lobby" (which respondent had referenced). The court advised that it had "two more emergencies" to address and asked if the parties could return at 1:15 p.m. Respondent stated that she was available but would have to appear via Zoom. The parties agreed to continue via Zoom at 1:15 p.m.

¶ 20 When the matter resumed, with all parties appearing via Zoom, petitioner's counsel attempted to introduce the video. As counsel proceeded to question Colin as to what the video depicted, the trial court asked counsel if he was seeking to admit the video as an exhibit. When counsel responded yes, the court asked counsel to first lay a foundation. Counsel then asked Colin if she had seen the video. She stated that she had not. Thereafter, the court denied counsel's motion to admit the video, stating that counsel could not satisfy all the foundational requirements.

¶ 21 After hearing closing argument on Colin's petition, the court stated that it would rule on her petition after conducting the hearing on Sanchez's petition.

¶ 22 Sanchez testified that she was a "site director at Boys & Girls Club at the Parkview site." She had three interactions with respondent. The first interaction occurred "during summer club,"

but Sanchez could not recall the date. On that occasion, she observed respondent give one of her children medication during drop-off. Respondent left before Sanchez could ask her what she had given the child. The staff was unaware of what it was, so Sanchez asked the child what respondent had given her. The child explained that it was allergy medicine. Later, when respondent picked up her children, she left and returned within a minute, "banging on the door" to be let in. The staff let respondent in, and she "started going off on [Sanchez]" because she had questioned what respondent had given to her daughter. Respondent left and then returned again, "banging on the door." She "went on a rant" in front of other members and staff about her child being bullied. She left and then returned yet again, "screaming." Respondent claimed that the "school" knew that her child was being bullied. Respondent told Sanchez to tell the alleged bully's mother that respondent was " 'going to kick [her] ass.' " In that light, Sanchez became worried about the safety of herself, the children, and the staff.

¶ 23    Sanchez testified that her second interaction with respondent occurred on August 14 or 15, 2024, at a school building where the club was meeting after school hours. Sanchez saw respondent's child playing with the alleged bully. Sanchez told the child that her mother did not want them to play together. Respondent's child told Sanchez that she and the alleged bully were friends. Sanchez asked the school's principal if there was a "bully contract" as to the children, and the principal confirmed that there was not. The principal called respondent, who arrived at the school within five or ten minutes. Respondent asked her daughter if "the staff [was] bothering [her]." When Sanchez interjected, respondent "put her hands in [Sanchez's] face" and told her "to shut up." Sanchez asked respondent to talk to her outside. When she told respondent that she wanted a staff member to join them "to avoid the hearsay," respondent stated, " '[I]t is okay if you are afraid of me.' " When they went outside, respondent "got in [her] face" and asked whether

there was a "hidden agenda against her daughters." Sanchez ended the conversation, telling respondent to "have a great day." According to Sanchez, "[respondent] kept on walking backwards doing a hand motion in her back pocket, stating she had something in her back pocket and she wasn't afraid to take it out." Sanchez took that as a threat and was afraid for her safety.

¶ 24 The third interaction occurred on August 19, 2024. Respondent entered the main lobby of the club's building around lunchtime. Sanchez heard her "screaming, threatening the staff, the admin." Sanchez heard her saying, " 'Arlene, I know you are up there. I am a m*** gangster. I am going to hunt you down. I am going to get you. Don't mess with mine.' " Respondent left the building. The police arrived, and Sanchez provided them with information about the situation. As Sanchez was walking away from the officers, respondent returned and said, " 'I am going to get you, bitch. I am going to hunt you down. I am going to get you.' " Sanchez went into the building, and respondent "still kept on screaming [her] name and that she was going to go and get [her]." Sanchez felt scared and threatened.

¶ 25 Sanchez knew that the building's lobby was video recorded. She had viewed the video from August 19, 2024. She stated that it accurately captured what occurred, though it did not show the police by the front door. The video was played for the trial court and introduced into evidence as Petitioner's exhibit No. 1. (As noted, the video is not in the record.)

¶ 26 Respondent testified that, on August 14, 2024, outside the building, she had a conversation with Sanchez about her questioning of respondent's children. Respondent was "upset" but not "angry to the point that [she] was on August 19th." Sanchez told respondent that she did not like her. Respondent testified that, against her wishes, her children were "dropped" from the program on August 19, 2024. The event sent her into "a manic state," and she went to the office to pick up

her check. Although she "did cuss them out," none of her threats were addressed at anyone other than Berg. She "spoke [Colin's] name" because she was part of the management.

¶ 27 The trial court asked respondent if she ever threatened Sanchez. Respondent stated: "Yes. I can admit that." She stated: "I think they have an audio of me outside yelling as I was walking out of the building. But no, not face to face." She stated that "the school *** provided [her] the whole video of the incident on the 14th" and that it would "prove how they are twisting words around." She stated further that she had "videos of Snapchat from kids of them being wronged."

¶ 28 On rebuttal, Sanchez testified that she never told respondent that she did not like her.

¶ 29 Following closing argument, the trial court continued the matter to November 19, 2024, for ruling on each petition.

¶ 30 On November 19, 2024, the trial court entered stalking/no contact orders in favor of each petitioner against respondent, effective from November 19, 2024, through November 19, 2026. The orders were erroneously marked as "*Emergency* Stalking No Contact" orders. (Emphasis added.) The record contains no transcript or other acceptable report of the November 19 proceeding. See Ill. S. Ct. R. 323(c), (d) (eff. July 17, 2017).

¶ 31 On November 25, 2024, the trial court entered plenary stalking/no contact orders in favor of each petitioner against respondent, effective from November 25, 2024, through November 19, 2026. The orders indicated that "[d]ue to [a] scrivener's error, the plenary stalking no contact order[s] [were] entered as an emergency on November 11, 2024." (We note that these new orders also contained scrivener's errors, in that they stated that emergency orders were entered on November 11, 2024, rather than November 14, 2024.) The orders also indicated that the parties were "[p]resent."

¶ 32    On November 25, 2024, respondent filed in each case the same motion to "[r]e-hear" and "[v]acate" that she filed on October 23, 2024.  On December 2, 2024, the trial court denied respondent's motions.

¶ 33    These timely appeals followed.  We consolidated the appeals for decision.

¶ 34                                II. ANALYSIS

¶ 35    Respondent's briefs in the two appeals are identical except for party information. Petitioners have not filed briefs, but the appeals are appropriate for our resolution without their input.  See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976).

¶ 36    Respondent's briefs violate various of our supreme court's rules on appellate briefing. Among them is Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020), requiring a "[s]tatement of [f]acts, which shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal[.]"  In each brief, respondent's statement of fact consists of (1) her bare assertion that she "was not properly served with the petition" and "only became aware of the hearing shortly before it occurred," (2) a claim that newly discovered evidence "indicates that [petitioners] had not actually viewed the video prior to testifying," and (3) a list of "new evidence" (which respondent identifies as text messages and voicemails without further specificity).  Thus, respondent has not provided a proper basis for understanding what transpired below, including what evidence was received at the hearing and why the trial court issued plenary stalking/no contact orders.  We would be justified in striking respondent's briefs for this violation of Rule 341(h)(6), but we will nevertheless proceed to her argument sections, which also fail to comply with Rule 341.

¶ 37    Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." It provides further that "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." *Id.* Respondent's arguments in support of the issues she identifies range in length from three to six sentences, consisting of a legal proposition of law and a conclusory statement, with no cogent application of the law or citation to record support. As the following demonstrates, respondent's contentions are either (1) improperly developed and, thus, forfeited or (2) patently without merit.

¶ 38                            A. Denial of Due Process

¶ 39    Respondent contends that she was denied due process in that she "was never served with the petition and learned of the hearing at the last minute." According to respondent, "the trial court's decision to proceed without ensuring proper service to *** [her] was erroneous and warrants reversal."

¶ 40    First, we note that respondent's motions below, asserting that she did not receive "prior notice," argued only that she did not receive prior notice of "the initial hearing in which the [e]mergency [s]talking [n]o [c]ontact [o]rder was entered." However, notice to the respondent is not required for entry of an emergency stalking/no contact order where the trial court finds "good cause to grant the remedy, regardless of prior service of process or of notice upon the respondent." See 740 ILCS 21/95(a)(3) (West 2022). The trial court here made such a finding in each emergency order. Thus, we find no error in the court's denial of her motions to vacate for lack of notice.

¶ 41    Nevertheless, respondent's argument on appeal is that she "was never served with the petition" before the plenary hearing. Section 60 of the Stalking No Contact Act (*id.* § 60(a)) states

that "[a]ny action for a stalking no contact order requires that a separate summons be issued and served." The summons "shall include the petition for stalking no contact order and supporting affidavits, if any, and any emergency stalking no contact order that has been issued." *Id.* "In Illinois, the process server's return affidavit is *prima facie* evidence of proper service, and the affidavit of service should not be set aside unless impeached by 'clear and convincing evidence.' " (Internal quotation marks omitted.) *Statia v. Orlet*, 2023 IL App (5th) 220731, ¶ 25. "Uncorroborated accounts of how the party was or was not served are insufficient; rather to impeach the affidavit of service, the defendant needs affirmative evidence." (Internal quotation marks omitted.) *Id.*

¶ 42 Here, the record in each case contains an affidavit of service indicating that respondent was served with the "Alias Summons and Order of Protection" at an address in East Dundee. Therefore, we presume that respondent was properly served. Respondent does not acknowledge these affidavits or otherwise challenge the manner or method of service. Thus, any such challenge is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.") Respondent's sole argument is that she "was never served." However, respondent has not directed us to any record evidence to support this claim. Respondent's bare assertion that she was not served is insufficient to overcome the presumption that service was proper. See *Statia*, 2023 IL App (5th) 220731, ¶ 25. Accordingly, respondent's argument fails.

¶ 43 We acknowledge that the trial court granted respondent's October 23, 2024, motions and vacated the default plenary orders. However, if the court had vacated the default plenary orders because notice was deficient, the court would not have reinstated the emergency orders and scheduled the petitions for a hearing.

¶ 44                                  B. Denial of Continuance

¶ 45     Next, respondent contends that the trial court abused its discretion in denying her request for a continuance. She claims that, "due to lack of notice," she "requested a continuance to adequately prepare her defense." However, she does not cite, nor has our independent search revealed, any part of the record in which she requested and was denied a continuance. Indeed, the October 30, 2024, status order reflects that, after the trial court vacated the October 2, 2024, default plenary orders, the matter *was* continued to November 14, 2024, for a rehearing, with the parties directed to exchange discovery by November 7, 2024. The record does not include a report of the October 30, 2024, proceeding. The hearings proceeded as scheduled on November 14, 2024. Nothing in the transcript of that hearing indicates that respondent requested a continuance. Accordingly, given the absence of any evidence that respondent requested and was denied a continuance, this argument is meritless.

¶ 46                                  C. Failure to Reopen Proofs

¶ 47     Next, respondent contends that she discovered "new evidence"—*i.e.*, "voicemails, texts, and video"—that contradicts petitioners' claims. She argues that "the trial court's refusal to reopen proofs in light of this new evidence was an abuse of discretion and should be reversed." Here, again, respondent does not cite, nor has our independent search revealed, any part of the record in which respondent requested and was denied a chance to reopen the proofs. Accordingly, this argument is meritless.[2]

---

[2]On April 21, 2025, respondent filed in each case a motion to supplement the record on appeal, asking to supplement the record with "new evidence that was not available during the trial proceedings." On April 29, 2025, we denied the motions because we may not consider materials that were "not before the trial court when it entered" the order appealed. See *Gomberg Sharfman P.C. v. Kuznar*, 2023 IL App (1st)

¶ 48                                                  D. False Testimony

¶ 49     Respondent next contends that "[t]he [t]rial [c]ourt [e]rred in [r]elying on [f]alse [t]estimony [r]egarding [v]ideo [e]vidence." With respect to each case, respondent argues: "Petitioner and her witnesses claimed to have viewed a video allegedly depicting *** [r]espondent engaging in certain conduct. However, this video was never presented to the court, and subsequent evidence indicates that the witnesses' claims were false. Relying on such false testimony undermines the integrity of the judicial process." We reject this contention.

¶ 50     First, as to Colin, nowhere in her testimony did she refer to a video or claim to have viewed one. Indeed, it was respondent who first referred to a video (without seeking its admission), during her own testimony. On rebuttal, Colin's counsel attempted to introduce that video through Colin. However, when counsel began to question Colin about the video, the court instructed counsel to first lay a foundation for the video's admission. After Colin stated that she had not reviewed the video, the court found that counsel did not satisfy the foundational requirements for admission, and the video was not admitted. Thus, because Colin never testified regarding a video and no video was admitted, respondent's claim that the court relied on Colin's "false testimony" about the video's content is meritless.

¶ 51     As to Sanchez, she testified regarding an incident on August 19, 2024, involving respondent, which was captured on video. Sanchez testified that she had seen the video and that it accurately depicted what she heard that day. The video was admitted into evidence over

---

221165-U, ¶ 58.

      On July 25, 2025, respondent filed in each case a second motion to supplement the record, attaching what she alleged was "key evidence that directly refutes false testimony and supports claims of improper service, coercion, and denial of due process." On August 11, 2025, we denied the motions.

respondent's objection. Respondent makes no argument on appeal that the video was improperly admitted. Thus, any such argument is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.") In any event, given that Sanchez testified that she saw the video, and the video was admitted into evidence and viewed by the court, respondent's claim on appeal that the court erred in relying on Sanchez's "false testimony" regarding the video is meritless. Further, because we do not have a report of the trial court's ruling, we have no way of knowing what weight the court gave to the video in entering the plenary orders.

¶ 52                                  E. Burden of Proof

¶ 53    Finally, respondent contends that "[t]he [p]etitioner[s] relied on testimony unsupported by documents or exhibits" and that "[t]he trial court accepted uncorroborated claims, which did not meet the burden required by law."

¶ 54    Under the Stalking No Contact Order Act (Act), a victim of stalking may seek a civil remedy requiring the stalker to stay away from him or her. 740 ILCS 21/5 (West 2022). A petitioner is required to prove stalking by a preponderance of the evidence. *Id.* § 30(a); *Piester v. Escobar*, 2015 IL App (3d) 140457, ¶ 12. "A 'preponderance of the evidence' means that the evidence presented renders a fact more likely than not." *J.M. v. Briseno*, 2011 IL App (1st) 091073, ¶ 41. " 'Stalking' means engaging in a course of conduct directed at a specific person, and [the respondent] knows or should know that this course of conduct would cause a reasonable person to fear for his or her safety, the safety of a workplace, school, *** or the safety of a third person or suffer emotional distress." 740 ILCS 21/10 (West 2022). " 'Course of conduct' means 2 or more acts, including but not limited to acts in which a respondent directly, indirectly, or through third parties, by any action, method, device, or means *** threatens a person, workplace,

- 15 -

school or place of worship[.]" *Id.* A trial court's determination that a preponderance of the evidence shows a violation of the Act will not be overturned unless it is against the manifest weight of the evidence. *Piester*, 2015 IL App (3d) 140457, ¶ 12. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Nicholson v. Wilson*, 2013 IL App (3d) 110517, ¶ 22.

¶ 55 Here, although respondent contends that petitioners failed to meet their burdens of proof, she does not cite the Act, discuss its requirements, discuss (or even cite) the challenged evidence, or argue why the evidence presented was insufficient. She claims only that the trial court "accepted uncorroborated claims." Accordingly, any challenge to the sufficiency of the evidence is forfeited for failing to comply with Rules 341(h)(6) and (h)(7). See *Trilisky v. City of Chicago*, 2019 IL App (1st) 182189, ¶ 54 ("The failure to elaborate on an argument, cite persuasive authority, or present a well-reasoned theory violates Rule 341(h)(7) and results in forfeiture of the argument.").

¶ 56 Forfeiture aside, we note that, in each case, the trial court heard testimony from petitioner and respondent and found that petitioner met her burden of proof.

> "Because the trial court is in a much better position to determine the credibility of the witnesses and the weight to be afforded conflicting testimony, the appellate court will not reconsider the evidence or reassess the witnesses' credibility or demeanor and will not substitute its judgment on such matters unless the trial court's findings are against the manifest weight of the evidence." *Reinneck v. Taco Bell Corp.*, 297 Ill. App. 3d 211, 219 (1998).

¶ 57 Colin's and Sanchez's testimonies, if believed, were sufficient to establish stalking under the Act. Colin testified to an incident at a community pool where respondent threatened to "beat

[Colin's] ass." She testified to a second incident at the club's building where respondent came in "yelling for [Colin]" and "telling everybody there that she was going to beat their ass," which could reasonably be viewed as an indirect threat to Colin. Sanchez testified to an incident where respondent walked "backwards doing a hand motion in her back pocket, stating she had something in her back pocket and she wasn't afraid to take it out." Sanchez reasonably interpreted this conduct as a threat. And Sanchez testified to another incident where respondent twice threatened her, stating, among other things, "I am going to hunt you down. I am going to get you."

¶ 58                               III. CONCLUSION

¶ 59     Based on the foregoing, we affirm the judgments in these consolidated appeals from the circuit court of Kane County.

¶ 60     Affirmed.